UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ANTHONY DIVINCENZO,
      Plaintiff,

v.              Case # 1:18-cv-662-DB

COMMISSIONER OF SOCIAL SECURITY,  MEMORANDUM DECISION
               AND ORDER
      Defendant.

## INTRODUCTION

Plaintiff Anthony Divincenzo ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") that denied his application for Disability Insurance Benefits ("DIB") under Title II of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned, in accordance with a standing order (*see* ECF. No. 13).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 8, 11. Plaintiff also filed a reply. *See* ECF No. 12. For the reasons set forth below, Plaintiff's motion (ECF No.8) is **GRANTED**, and the Commissioner's motion (ECF No. 11) is **DENIED**.

## BACKGROUND

On August 25, 2014, Plaintiff protectively filed a Title II application for a period of disability and DIB, alleging disability beginning on September 23, 2013 (the disability onset date), due to: to lifelong atrial fibrillation, dizziness, weakness, back pain, arthritis, fatigue, high blood pressure, an enlarged prostate, and bad vision. Transcript ("Tr.") 178-84, 216. Plaintiff's application was denied initially on September 23, 2015, after which he requested an administrative

hearing. Tr. 77-83, 86-95. Plaintiff's hearing was held via video before Administrative Law Judge Christine Cutter (the "ALJ") on June 8, 2017. The ALJ presided over the hearing from Portland, Maine. Tr. 17. Plaintiff appeared and testified from West Seneca, New York, and was represented by Justin Goldstein, an attorney. Tr. 17. Susan Howard, an impartial vocational expert ("VE"), also appeared and testified at the hearing. *Id*. The ALJ issued an unfavorable decision on January 29, 2018, finding Plaintiff not disabled. Tr. 12-30. On April 13, 2018, the Appeals Council denied Plaintiff's request for further review. Tr. 1-8. The ALJ's decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I. District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

### II. The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful

work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

# ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in her January 29, 2018 decision:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2017;

2. The claimant has not engaged in substantial gainful activity since September 23, 2013, the alleged onset date (20 CFR 404.1571 *et seq*.;

3. The claimant has the following severe impairments: degenerative disc disease and left shoulder degenerative joint disease (20 CFR 404.1520(c));

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526);

5. The claimant has the residual functional capacity to perform a full range of light work[1] as defined in 20 CFR 404.1567(b) and 416.967(b);

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565);

7. The claimant was born on October 22, 1956, and was 56 years old, which is defined as an individual of advanced age, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching retirement age (20 CFR 404.1563);

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564);

9. The claimant has acquired work skills from past relevant work (20 CFR 404.1568);

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a) and 404.1568(d));

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 23, 2013, through the date of this decision (20 CFR 404.1520(g)).

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

Tr. at 14-29.

Accordingly, the ALJ determined that, for the application for a period of disability and disability insurance benefits, protectively filed on August 25, 2014, Plaintiff is not disabled under sections 216(i) and 223(d) of the Social Security Act. *Id*. at 28.

## **ANALYSIS**

Plaintiff alleges one point of error. He contends that the RFC is faulty because the ALJ did not base it on a medical opinion, but rather based the RFC on her own lay opinion. *See* ECF No. 8-1 at 11-16. Plaintiff points to the consultative state examiner's opinion that a RFC could not be determined because of insufficient evidence and the lack of an orthopedic and cardiac consultative examinations. *Id*. at 9. "A RFC determination must account for limitations imposed by both severe and non-severe impairments." *Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) (citing 20 C.F.R. § 404.1545(a)(2)). With respect to Plaintiff's prior cardiac history, the ALJ found the dysrhythmias to be non-severe. Plaintiff, as noted, had a long history of Paroxsymal (sudden) Atrial Fibrillation ("A-Fib").[2] Paroxysmal A-Fib, which simply means that it comes and goes and does not persist, is the most common heart rhythm abnormality in the United States. *See Gerace v. United States*, No. 5:03 CV 166 NPM/GHL, 2006 WL 2376696, at *1 (N.D.N.Y. Aug. 10, 2006), *aff'd*, 272 F. App'x 6 (2d Cir. 2008). The ALJ noted that in 2013 Plaintiff's A-Fib was converted to normal sinus rhythm after hospitalization. Tr. 19-20. An echocardiogram demonstrated normal ventricular size and an ejection fraction of 60-65%. *Id*. Plaintiff underwent two ablations two years apart. *Id*.

---

[2] AFib is caused by many irritable parasystolic atrial foci firing at rapid rates, producing an exceedingly rapid, erratic atrial rhythm rate of 350-450 beats per minute. DALE DUBIN, MD, RAPID INTERPRETATION OF EKG'S 66 (6th ed. 2000).

5

Despite his prior A-Fib, Plaintiff was cleared for shoulder surgery in 2016. Tr. 20. In August 2016, Plaintiff's treating cardiologist Muzamil Rana, M.D., FACC ("Dr. Rana"), noted that Plaintiff could walk briskly for one block and go up a flight of stairs. Tr. 797. Plaintiff denied any symptoms of chest pain, jaw pain or arm pain at rest or with exertion; he had not experienced any significant palpitations; and his EKG showed sinus rhythm with nonspecific ST-T wave abnormality and occasional PACs ("Premature Atrial Contractions") with no changes from a prior EKG. *Id*. Dr. Rana noted that Plaintiff's functional capacity was greater than 4METS (four metabolic equiavlents), and his stress test from two years previous showed no signs of ischemia. *Id*. Ultimately, the cardiologist concluded that "[f]rom a cardiac standpoint, [Plaintiff could] proceed with shoulder surgery with low to moderate risk." *Id*.

Plaintiff saw the cardiologist again in February 2017. Tr. 961. He noted that Plaintiff underwent shoulder surgery without any cardiac issues. *Id*. Again noted was no pain at rest or exertion. *Id*. Plaintiff reported that "once he had palpitations that lasted intermittently for a few hours." *Id*. There was no associated shortness of breath, dizziness or lightheadedness. *Id*. The EKG demonstrated normal sinus rhythm, and the cardiac exam showed normal first and second heart sounds, regular rate and rhythm. *Id*. There were no murmurs, rubs or gallops; Plaintiff's extremities showed no edema; and his "rare palpitations" were noted as "self-limiting." *Id*. In the latest treatment record from the cardiologist in January 2017, Plaintiff denied any cardiovascular or musculoskeletal symptoms. Tr. 966. The treatment record goes on to note that his rate and rhythm are regular; S1 and S2 are normal; no heart murmurs are appreciated; and there is no bilateral edema. Tr. 967.

Plaintiff's orthopedic records also indicate no chest pain, change in exercise tolerance, faintness, swelling of ankles and vein problems. Tr. 762. Prior to having ablation, Plaintiff noted

rare episodes of fluttering in his chest lasting a couple of seconds maybe once a week. Tr. 363. There were no complaints of chest pain or dizziness. *Id*. Also prior to ablation, Plaintiff's A-Fib was stable on amiodarone. Tr. 365. He did complain of feeling poorly which was thought to be related to bradycardia. Tr. 365. Prior to Plaintiff's first ablation, a Holter monitor showed that he was in sinus rhythm with bradycardia with 1 minute of atrial fibrillation. Tr. 374. He stated that he had been doing well and denied any racing, palpitation, chest pain or shortness of breath. *Id*. He was admitted in November 2013 for a flare-up of his A-Fib, and thereafter, had his first ablation. Tr. 399.

Having reviewed the record, the question before the Court is whether there is enough evidence for the ALJ to find Plaintiff capable of light work in light of his history of A-Fib. If the record contains sufficient evidence from which the ALJ can assess Plaintiff's RFC, a medical source statement is not necessarily required. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29 (2d Cir. 2013) (affirming ALJ's RFC determination based on extensive medical record despite the fact that the record did not include formal opinions as to the claimant's RFC). In this case, the Court finds that the RFC for light work properly accounted for Plaintiff's prior cardiac history, as noted by the ALJ. As discussed above, there is evidence in the record that Plaintiff could walk briskly for one block; he denied pain on exertion or at rest; his heart sounds were normal; he had no edema; and any palpitations were scarce and self-limited. Furthermore, Plaintiff's EKGs after the ablation treatments were normal; his nuclear stress test showed no ischemia; and treatment records demonstrated no cardiovascular complaints. His ejection fraction was well above 50% at 63%. Tr. 382-83. A normal ejection fraction (the percentage of blood pumped out of a filled ventricle with each heartbeat) is 55-70 percent. The term "ejection fraction" refers to the

percentage of blood that is pumped out of a filled ventricle with each heartbeat. *See Townsend v. Comm'r of Soc. Sec.*, No. 11-CV-801 JG, 2011 WL 3648346, at *2, n.6 (E.D.N.Y. Aug. 17, 2011).

The records reflect that no limitations were placed on Plaintiff. Further, Plaintiff worked with this condition for a number of years prior to shutting down his business for financial reasons. In the absence of some mental limitation on the part of the claimant, the ALJ is given some leeway to base his or her RFC on a common sense judgment. *Gross v. Astrue*, No. 12-CV-6207P, 2014 WL 1806779, at *18 (W.D.N.Y. May 7, 2014) (finding that "an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment") (internal citation omitted). To require an ALJ to obtain an independent cardiac consultative exam based on the detailed record before her and the underlying medical evidence defies common sense.

With respect to accounting for Plaintiff's orthopedic impairments, the ALJ's RFC is somewhat more problematic. The question is whether the ALJ should have obtained an independent orthopedic consultative opinion when there were no express limitations noted by the treating physicians, and Plaintiff habitually "played doctor" himself by refusing to follow the advice of his neurology and orthopedic doctors. Almost a year after filing for disability, Plaintiff saw Gregory J. Castiglia, M.D. ("Dr. Castiglia"), for a neurosurgical consultation. Tr. 468-70. Dr. Castiglia diagnosed Plaintiff with lumbar degenerative disc disease, peripheral neuropathy and lumbar spondylosis. Tr. 470. X-rays of his lumbar spine demonstrated, in part, degenerative anterior spurring throughout the lower thoracic and upper lumbar spine. Tr. 510. An MRI in July 2014 noted mild degenerative anterior spurring in the lower thoracic and upper lumbar spine. Tr. 475. However, at L4-5, a posterior herniation more severe to the right effacing the right ventral thecal sac and the traversing right L5 nerve root was noted. *Id*. In late July 2014, Plaintiff saw Dr. Castiglia again, at which time Dr. Castiglia reviewed the various studies. Tr. 480. Epidural steroid

injections were recommended, and Plaintiff stated he would discuss with his wife. *Id*. There are no further treatment records related specifically to Plaintiff's back condition. The Court notes that the ALJ makes several references to office visits with other doctors where Plaintiff related no specific back complaints. *See generally* Tr. 23-25.

In June 2016, Plaintiff had a consultation with Ryan Wilkins, M.D. ("Dr. Wilkins") concerning left shoulder pain. Tr. 643. He was diagnosed with bursitis of the left shoulder and left shoulder impingement syndrome. *Id*. X-rays noted mild degenerative changes and spurring in the shoulder joint. Tr. 644. Among other findings, an MRI noted moderately severe supraspinatus tendinosis. Tr. 645. On August 9, 2016, Plaintiff had surgery on his left shoulder. Tr. 764. The post-operative diagnosis was left shoulder subacromial impingement rotator cuff tendinosis, partial articular sided rotator cuff tear, degenerative labral tearing, and acromioclavicular joint arthrosis. Tr. 764. At his last consultation with Dr. Wilkins, Plaintiff continued to complain of pain, which Dr. Wilkins believed to be cervical related. Tr. 769. Dr. Wilkins noted that Plaintiff refused physical therapy because he does his own home exercises. *Id*. Dr. Wilkins also recommended that Plaintiff see a spine specialist. *Id*. Evidently, Plaintiff never followed his doctor's advice, for this is the last orthopedic treatment record before the Court. The last records from his primary physician note he has no cardiac or musculoskeletal complaints. Tr. 966. Further notes reflect that Plaintiff refused to see a specialist about his neck pain and lumbar issues. Tr. 967-68. Plaintiff's seeming unwillingness to heed his providers' advice is also problematic. However, given the duty of the ALJ to fully develop the record, even under these circumstances, the Court finds that this case should be remanded for an independent orthopedic evaluation to assist in determining (or confirming) an appropriate RFC. The Court finds no other error in the ALJ's decision.

## CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 8) is **GRANTED**, the Commissioner's Motion for Judgment on the Pleadings (ECF No. 11) is **DENIED**, and this matter is **REMANDED** to the Commissioner for further administrative proceedings consistent with this opinion, pursuant to sentence four of 42 U.S.C. § 405(g). *See Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir. 2000). On remand, the ALJ is directed to secure an independent orthopedic examination. Plaintiff is expected to fully comply. The Clerk of Court is directed to enter judgment and close this case.

**IT IS SO ORDERED**.

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE